UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES KYLE MILLER,

      Plaintiff,

v.

KELLEY RYBICKI *et al.*,

      Defendants.

_____/

Case No. 15-cv-12984
Hon. Matthew F. Leitman

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (ECF ## 25, 26)

On September 4, 2012, Plaintiff James Kyle Miller ("Miller") went to a bar, drank 10-15 shots of whiskey and four beers in a relatively short time frame, got into a profanity-laced shouting match with bar staff and customers, threatened to kill bar patrons, and threw broken bar glasses at them. Unsurprisingly, the night did not end well for Miller. After the altercation at the bar, Miller fled on foot into a densely wooded area. A police tracking dog eventually located Miller, bit him, and held the bite until officers could subdue him and safely take him into custody. Miller was charged with (1) felonious assault and (2) resisting and obstructing a police officer, but both charges were ultimately dismissed.

In this action, Miller asserts claims under 42 U.S.C. § 1983 against the officers, police agencies, and governmental units involved in his seizure, arrest, and

prosecution. (*See* Compl., ECF #1.)  In an Opinion and Order dated February 16, 2016, the Court dismissed some of Miller's claims and allowed others to proceed to discovery (the "Initial Opinion and Order"). (*See* ECF #20.)  Defendants now move for summary judgment on Miller's remaining claims (the "Motions"). (*See* ECF ## 25, 26.)  For the reasons that follow, the Court **GRANTS** summary judgment in favor of the Defendants on all of Miller's remaining claims.

## I

The Court's Initial Opinion and Order described the factual background of this action. (*See* ECF #20 at Pg. ID 372-75.)  The Court incorporates that background here and sets forth below only those facts essential to the resolution of the claims now before the Court.

On September 4, 2012, Miller and his cousin Curtis Brown ("Brown") went to the Lost Shoe Tavern in Jackson County, Michigan, between 8:00 and 9:00 p.m. (*See* Miller Dep. at 100, ECF #26-2 at Pg. ID 499.)  Over the next several hours, Miller drank heavily.  He consumed between 10-15 shots of "Jack Daniel's" whiskey and four "Bud Light" beers. (*Id.* at 100-103, ECF #26-2 at Pg. ID 499-500.)  His blood alcohol level was at least .20 (*see id.* at 70, ECF #26-2 at Pg. ID 492) – over the so-called "superdrunk" threshold in Michigan's drunk driving laws. *See* M.C.L. § 257.625.

Brown also drank heavily and became "pretty drunk." (Miller Dep. at 106, ECF #26-2 at Pg. ID 501.) Brown eventually began "[y]elling, screaming," and using "profanity." (*Id.* at 106, ECF #26-2 at Pg. ID 501.) By that time, the bartender had had enough of Brown's antics, and she told Miller to take Brown home. (*See id.* at 109-10, ECF #26-2 at Pg. ID 502.) In response, Miller "told her it was bullshit [that she] was making me drive him home drunk." (*Id.* at 110, ECF #26-2 at Pg. ID 502.)

Brown eventually made his way to the parking lot and started "bang[ing]" on several cars. (*Id.* at 111, ECF #26-2 at Pg. ID 502.) Miller, several bar patrons, and bar staff followed Brown outside to investigate his destructive conduct. One of these individuals accused Brown of smashing her truck, and Brown replied that he "hit it because they cut me off. Bullshit." (*Id.* at 114, ECF #26-2 at Pg. ID 503.) Brown then "freak[ed] out" on the patrons in the parking lot, and one of them punched Brown, "drop[ing] him" to the ground. (*Id.* at 115-16, ECF #26-2 at Pg. ID 503.)

Miller then became mixed up in the ongoing fracas. One of the customers from the bar hit Miller's head with the door of a truck, drawing blood. (*See id.* at 117, ECF #26-2 at Pg. ID 504.) Then Miller lost control. He yelled that he was "going to kill" the patrons from the bar and that his dad "was going to bury [them] six feet under." (*Id.* at 117-18, ECF #26-2 at Pg. ID 504.)

Miller then re-entered the bar and demanded that the bartender call the police. (*See id.* at 124, ECF #26-2 at Pg. ID 505.) He says that he was scared of the other patrons in the bar and that he chose to protect himself by breaking two bar glasses and throwing the glasses at them. (*See id.* at 131, ECF #26-2 at Pg. ID 507.) One of the patrons eventually tackled Miller, but Miller forced his way off the ground and exited the bar. (*See id.* at 132-35, ECF #26-2 at Pg. ID 507-08.) After leaving the bar this time, Miller walked into a nearby wooded area. (*See id.* at 143, ECF #26-2 at Pg. ID 510.)

At or around the time Miller fled into the woods, Jackson County Sheriff Deputies Kelly Rybicki ("Rybicki") and Jason Breining ("Breining") arrived on the scene. Upon their arrival, Rybicki entered the bar to speak with patrons while Breining remained outside with Brown. Rybicki spoke with four witnesses inside the bar, including the Lost Shoe Tavern's bartender, Melissa Hanson, and the two individuals at whom Miller allegedly threw the bar glasses, Melissa Tackett and Travis Tackett. (*See* Rybicki Dep. at 10, ECF #26-6 at Pg. ID 620.) During this initial round of interviews, Rybicki came to believe that "a knife" may have been "involved" in the assault. (*Id.* at 19, ECF #26-6 at Pg. ID 622.) Rybicki then exited the bar and told Breining that Miller may have used a knife during the altercation at the tavern. (*See* Rybicki's dash-cam video recording, ECF #17.)

Rybicki then went back into the bar and spoke again with the witnesses. During this second conversation, the witnesses clarified that a patron had retrieved the knife from Miller's car, that the knife was inside the bar for safe-keeping, and that the assault inside the bar involved only bar glasses. (*See* Rybicki Dep. at 20, ECF #26-6 at Pg. ID 620; *see also* dash-cam video, ECF #17.)

Rybicki next exited the bar and spoke again with Breining. (*See* ECF #17.) She told him that the individuals inside the bar had offered a "revamp[ed]" version of events. (*Id.*) She explained to Breining that under the revised account, Miller used bar glasses during the assault. (*See id.*)

Based on Miller's use of the bar glasses, Breining concluded that Miller had committed a "felonious assault." (Breining Dep. at 14, 19, ECF #26-5 at Pg. ID 603-04.) Breining thereafter summoned a canine unit to help locate Miller. (*See id.* at 19, ECF #26-5 at Pg. ID 604.) Defendant Christopher Jacobson ("Jacobson"), a canine officer with the Blackman Township Police Department, then arrived with his tracking dog named Zando. According to Jacobson, Breining told him (Jacobson) that Miller had been involved in an altercation involving a knife. (*See* Jacobson Dep. at 9, 36, 41 46, ECF #26-4 at Pg. ID 578, 584, 586-87.)[1] After hearing

---

[1] At Breining's deposition, he did not recall telling Jacobson that Miller had used a knife during the assault inside the bar. (*See* Breining Dep. at 23, ECF #26-5 at Pg. ID 605.) However, when asked specifically, Breining said that he had no reason to dispute Jacobson's testimony that he (Breining) had "mentioned to [Jacobson] when

Breining's report, Jacobson was concerned that Miller may have been armed and may have posed a threat to those tracking him. (*See id.* at 19, ECF #26-4 at Pg. ID 580.)

Jacobson and Zando then entered the wooded area to begin tracking Miller. During the entirety of the track, Jacobson had exclusive control over Zando. (*See id.* at 13-15, ECF #26-4 at Pg. ID 579.) Breining did not control or direct Zando in any way. (*See id.*; *see also* Breining Dep. at 16-17, ECF #26-5 at Pg. ID 603-04.) Instead, Breining trailed about 20 to 30 yards behind Jacobson. (*See* Breining Dep. at 16-17, ECF #26-5 at Pg. ID 603-04.)

During the track, Jacobson had Zando on a "30 foot" lead (i.e., a 30-foot leash), and they proceeded in what Jacobson called "stealth" mode – meaning that they did not announce their presence or give any advance warning or notice to Miller that they were approaching. (Jacobson Dep. at 14, ECF #26-4 at Pg. ID 579.) Jacobson explained that he operated in stealth mode because he was concerned that he would be vulnerable to "ambush" in the dark woods if he revealed his presence and location. (*Id.*)

Zando eventually found Miller, knocked him down (*see* Miller Dep. at 157, ECF #26-2 at Pg. ID 514), and bit down onto Miller's left leg in order to control

---

[Jacobson] arrived on the scene that there might have been a knife involved somehow in the incident." (*Id.* at 27, ECF #26-5 at Pg. ID 606.)

him. (*See* Jacobson Dep. at 17-18, ECF #26-4 at Pg. ID 580.)  Jacobson did not witness the initial take-down because he was thirty feet behind Zando; Jacobson came upon Miller as Zando was biting down on him. (*See id.* at 29-30, ECF #26-4 at Pg. ID 583.) Jacobson did not immediately order Zando to release Miller.  Instead, Jacobson allowed Zando to hold the bite so that Breining – who was thirty yards behind Jacobson – could catch up to them. (*See id.* at 19-20, ECF #26-4 at Pg. ID 580.)

Jacobson explained that he permitted Zando to maintain the bite until Breining was "available" because Jacobson believed, based upon what Breining had told him, that Miller could have been armed and could have posed a danger. (*Id.*)  Jacobson pulled Zando off of Miller just as Breining arrived on the scene; Breining did not see Zando biting Miller. (*See* Breining Dep. at 18, ECF #26-5 at Pg. ID 604.)  After Zando disengaged, Breining arrested Miller and called an ambulance so that Miller could receive treatment for the dog bite. (*See id.* at 18, 24-25, ECF #26-4 at Pg. ID 604-06.)  Miller at first "refused" treatment, but eventually he was "transport[ed]" to the hospital. (*Id.* at 25-27, ECF #26-5 at Pg. ID 606.)

Miller admits that he was "significantly intoxicated and [was] swearing" at the medical professionals at the hospital who attempted to treat his wound. (Miller Dep. at 73, ECF #26-2 at Pg. ID 493.)  Miller's medical records from his visit to the hospital that evening indicate that:

- He was initially "belligerent and refusing all care."
- He had to be placed in two-point restraints.
- A neurological examination revealed that he exhibited "aggressive behavior with violent tendency consistent with alcohol induced rage syndrome."
- He stated that he "refuse[d] to take any antibiotics" because he hoped that "his wound [would] get[] infected so [that] he [could] call his lawyer."
- He was diagnosed with "acute (sudden) alcohol intoxication."

(Medical Records, ECF #26-3.)

After leaving the hospital, Miller was charged with (1) felonious assault and (2) resisting and obstructing an officer. The charges were eventually dismissed.

## II

On August 21, 2015, Miller filed his Complaint in this action. (*See* ECF #1.) Miller asserted claims against Rybicki, Breining, the Jackson County Sheriff's Office, Jackson County, Jacobson, the Charter Township of Blackman ("Blackman Township"), and the Blackman Township Police Department for excessive force, unlawful arrest, malicious prosecution, violation of his rights under the Due Process Clause, and governmental liability. (*See id.*)

On October 26, 2015, Rybicki, Breining, the Jackson County Sheriff's Office, and Jackson County (collectively, the "Jackson County Defendants") moved for dismissal or, in the alternative, for summary judgment on all of the claims against them (the "First Dispositive Motion"). (*See* ECF #10.) Following full briefing and

a hearing, the Court issued the Initial Opinion and Order in which it dismissed Miller's claims against Jackson County and the Jackson County Sheriff's Department, dismissed Miller's malicious prosecution and Due Process Clause claims against the Jackson County Defendants, and dismissed his excessive force claim against Rybicki. After the Court issued the Initial Opinion and Order, the claims that remained in this action were:

- Miller's claim that Rybicki and Breining violated his constitutional rights when they arrested him without probable cause;
- Miller's excessive force claim against Breining; and
- Miller's claims against Defendants Jacobson, Blackman Township, and the Blackman Township Police Department (collectively, the "Blackman Township Defendants") for excessive force, violation of his Due Process rights, malicious prosecution, and municipal liability.

The Defendants now seek summary judgment on Miller's remaining claims. (*See* ECF ## 25, 26.) The Court held a hearing on the Motions on April 17, 2017.

### III

The Defendants move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact...." *U.S. SEC v. Sierra Brokerage Services, Inc.,* 712 F.3d 321, 326–27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, (1986)) (quotations omitted). When

reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson,* 477 U.S. at 252. However, summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251-252. Indeed, "[c]redibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge…" *Id.* at 255.

# IV

## A

In Count II of his Complaint, Miller alleges that Rybicki, Breining, and Jacobson violated his rights under the Fourth Amendment when they arrested him without probable cause.[2] (*See* Compl. at ¶28, ECF #1 at Pg. ID 5.) In order to prevail on this claim, Miller must establish that these Defendants "lacked probable cause" to arrest him. *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 675-677 (6th Cir. 2005). "Probable cause to make an arrest exists if, at the moment of the arrest,

---

[2] Miller's Complaint does not contain a "Count I." (*See* Compl., ECF #1.) In "Count II," titled "Right to be Free from Unlawful Search and Seizure," Miller brings claims for unlawful arrest, malicious prosecution, and excessive force. (*See id.* at ¶28, ECF #1 at Pg. ID 5.)

the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the arrestee had committed or was committing an offense." *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) (internal punctuation omitted).

In the Initial Opinion and Order, the Court explained that there was "substantial evidence that there *was* probable cause to arrest Miller." (Initial Op. and Order, ECF #20 at Pg. ID 379; emphasis in original). That evidence included a video recording from Rybicki's vehicle establishing that Rybicki had been told by witnesses to the altercation that Miller had thrown broken bar glasses at patrons in the bar. (*See* ECF #17.) The witness accounts were sufficient to establish probable cause to believe that Miller had committed a crime.

However, the Court declined to grant summary judgment in favor of Rybicki and Breining at that time because "it [was] at least possible … that a recording or deposition could bring to light evidence that would undermine the existence of probable cause." (Initial Op. and Order, ECF #20 at Pg. ID 380.) The Court further noted that it was "highly unlikely" that Miller would find such evidence and that it appeared "highly likely that the Court [would] ultimately enter summary judgment against Miller on his claim that his arrest was not supported by probable cause." (*Id.* at Pg. ID 379-80.)

Discovery is now closed and Miller has not presented to the Court any evidence that undermines the probable cause to arrest established by the witness statements to Rybicki. Indeed, the depositions of officers Rybicki and Breining *confirm* that before Miller was arrested, (1) witnesses told Rybicki that Miller had attempted to assault other patrons with bar glasses and (2) Rybicki relayed that information to Breining. (*See*, *e.g.*, Rybicki Dep. at 13, 19, ECF #26-6 at Pg. ID 622-23; *see also* Breining Dep. at 14, 19, ECF #26-5 at Pg. ID 603-04.) And Miller has not presented any evidence to suggest that at the time of his arrest, Rybicki and Breining had any reason to doubt the information given to them by the witnesses. Because Rybicki and Breining "had reasonably trustworthy information" that Miller had "committed an offense," they had probable cause to arrest him. *Klein*, 275 at 550.

Miller counters that even if the witnesses' statements were sufficient to support probable cause, Rybicki and Breining had a duty to conduct a further investigation, and Miller insists that such additional inquiry would have revealed that the witnesses were lying and that probable cause thus did not exist. But Miller has not cited any authority in support of the proposition that even after law enforcement officers have probable cause to arrest, they must continue to investigate and cannot make an arrest until they have completed their investigation. Because

Breining and Rybicki did have probable cause at the time of Miller's arrest, they are entitled to summary judgment on his unlawful arrest claim.

Jacobson is likewise entitled to summary judgment on that claim. Jacobson cannot be held liable because, as described above, the arrest *was* supported by probable cause. Moreover, Jacobson did not effect the arrest; he simply assisted with the track and seizure of Miller. (*See*, *e.g.*, Jacobson Dep. at 25, ECF #26-4 at Pg. ID 582.)

For these reasons, the individual Defendants are entitled to summary judgment on Miller's claim of unlawful arrest.[3]

## B

Miller also brings a claim for malicious prosecution in Count II of his Complaint. (*See* Compl. at ¶28, ECF #1 at Pg. ID 5.) In the Initial Opinion and Order, the Court granted summary judgment in favor of the Jackson County Defendants on this claim because (1) a state-court judge found there was probable

---

[3] The Court has already dismissed all of Miller's failure-to-train claims against Jackson County and the Jackson County Sheriff's Office. (*See* Initial Op. and Order, ECF #20.) It is not clear whether Miller is asserting a failure-to-train claim against Blackman Township and/or the Blackman Township Police Department related to the alleged lack of probable cause for his arrest. If he is asserting such a claim, it fails as a matter of law because, for the reasons explained above, the arrest was supported by probable cause. *See Thomas v. City of Columbus*, --- F.3d ---, 2017 WL 1394795, at *5 (6th Cir. Apr. 19, 2017) (affirming summary judgment on failure-to-train claim brought against municipality because "no constitutional violations occurred" and "[n]o constitutional violation means no municipal liability").

cause to support Miller's felonious assault charge, and that finding was fatal to Miller's malicious prosecution claim, and (2) Miller had neither pleaded nor identified "a deprivation of liberty apart from his initial arrest." (Initial Op. and Order, ECF #20 at Pg. ID 381-83.)

The Blackman Township Defendants now move for summary judgment of Miller's malicious prosecution claim on essentially the same grounds. (*See* Blackman Township Def.s' Mot., ECF #26 at Pg. ID 465-66.) Miller has not shown any error in the Court's earlier conclusion that his malicious prosecution claim fails as a matter of law. Thus, for the reasons stated in the Initial Opinion and Order with respect to the Jackson County Defendants – which the Court incorporates by reference – the Court will grant summary judgment in favor of the Blackman Township Defendants on Miller's malicious prosecution claim.

## C

Finally in Count II of his Complaint, Miller alleges that Jacobson and Breining used excessive force in violation of the Fourth Amendment when they seized him in the woods.[4] (*See* Compl. at ¶28, ECF #1 at Pg. ID 5.) The excessive force underlying this claim is the bite applied by Zando. The Court will address the claim against each Defendant separately below.

---

[4] Miller also brought this claim against Rybicki. (*See* Compl at ¶28, ECF #1 at Pg. ID 5.) The Court granted summary judgment in Rybicki's favor on this claim in the Initial Opinion and Order. (*See* Initial Op. and Order, ECF #20 at Pg. ID 384-85.)

**1**

**a**

Jacobson argues that he is entitled to summary judgment on the excessive force claim under the doctrine of qualified immunity. "Qualified immunity protects public officials from liability from civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (internal quotation marks omitted). "Once raised, it is the plaintiff's burden to show that the defendant [ ] [is] not entitled to qualified immunity." *Kinlin v. Kline*, 749 F.3d 573, 577 (6th Cir. 2014).

Courts follow a "two-tiered inquiry to determine if an officer is entitled to qualified immunity." *Martin*, 712 F.3d at 957 (internal quotation marks omitted). "The first step is to determine if the facts alleged make out a violation of a constitutional right. The second is to ask if the right was 'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it. These two steps may be addressed in any order." *Id.* (internal citations omitted).

The first tier of the qualified immunity analysis in this action focuses on whether Zando's bite constituted excessive force. A claim that a government actor "used excessive force during the course of a seizure is analyzed under the Fourth

Amendment's 'objective reasonableness' standard." *Chappell v. City of Cleveland*, 585 F.3d 901, 908 (6th Cir. 2009) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)). The objective reasonableness analysis "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. The Court must analyze this conduct "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

The second tier of the qualified immunity analysis here asks whether it was clearly established that Zando's bite amounted to excessive force. With respect to the "clearly established" inquiry, "[t]he sources of clearly established law to be considered are limited. [Courts in this Circuit] look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within [the Sixth] [C]ircuit, and finally to decisions of other circuits." *Martin*, 712 F.3d at 961. "The plaintiff has the burden of showing that a right is clearly established." *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) (citing *Barrett v. Steubenville City Sch.,* 388 F.3d 967, 970 (6th Cir. 2004)).

**b**

Jacobson is entitled to qualified immunity because it was not clearly established that Zando's bite amounted to excessive force.

16

The Sixth Circuit's decision in *Campbell v. City of Springboro*, 700 F.3d 779, 788 (6th Cir. 2012), "outlined the contours of the right to be free from excessive force in police canine cases." *Rainey v. Patton*, 534 Fed. App'x 391, 396 (6th Cir. 2013) (describing *Campbell*). In *Campbell*,

> [the Sixth Circuit] noted the range of developed law, observing that summary judgment in favor of [an] officer has been upheld where there were 'potentially dangerous' suspects who exhibited 'irrational behavior' and when the suspects were in unlit buildings or heavily wooded areas where the 'police were vulnerable to ambush.' On the other end of the spectrum, [the court in *Campbell*] noted that summary judgment on qualified immunity grounds was denied in cases in which the officer 'allowed a little-trained canine, who had previously bitten someone, to bite a handcuffed suspect.'

*Id.* (quoting *Campbell*, 700 F.3d at 789).

With respect to the claim against Jacobson, this case is much closer to the end of the spectrum at which the Sixth Circuit has granted summary judgment to police officers in excessive force cases involving dog bites. Based upon the information provided to Jacobson by Breining, Jacobson reasonably believed that he was tracking a suspect who had threatened to kill other individuals and who could be armed with a deadly weapon. (*See* Jacobson Dep. at 9, 14 19, 36, ECF #26-4 at Pg. ID 578-80, 584). And the track was occurring in a dark and heavily wooded area. (*See id.* at 30-31, ECF #26-4 at Pg. ID 583.) Moreover, the record contains evidence that Zando was not a "little-trained canine;" in fact, he received regular training. (*See*

*id.* at 33-34, ECF #24-6 at Pg. ID 584.)  Finally, the record does not contain evidence that Zando had previously engaged in unjustified biting.  Miller has not cited any controlling decision holding that a dog bite constitutes excessive force under these circumstances.

Instead, Miller focuses on the length of the bite – approximately one minute – and he contends that even if the Fourth Amendment permitted Jacobson to deploy Zando against him, Jacobson used excessive force in permitting Zando to maintain the bite for so long.  But, as Jacobson explained, he allowed Zando to hold the bite because Breining told him that Miller had been armed and violent, and he (Jacobson) believed that he had to permit Zando to retain control of Miller until Breining was "available" so that Miller could safely be taken into custody. (*Id.* at 19-20, ECF #26-4 at Pg. ID 580.)  Jacobson was permitted to rely on Breining's statements that Miller was previously armed and could be dangerous. *See*, *e.g.*, *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008). And Miller has not cited any cases holding that an officer may not permit a dog to maintain a bite where the officer reasonably believes that (1) the suspect may pose a danger and (2) having the dog release sooner would compromise officer safety.  Stated another way, Miller has not shown that Jacobson violated any clearly established constitutional rules when Jacobson allowed Zando to hold the bite.

Miller also argues that clearly established law required Jacobson to give a warning before allowing Zando to bite him (Miller). Miller's primary authority for this proposition is a 1991 decision from the United States Court of Appeals for the Fourth Circuit, *Kopf v. Wing*, 942 F.2d 265 (4th Cir. 1991), in which that court did suggest that an officer must warn a suspect before allowing a dog to bite. But subsequent decisions from that court have "muddied the question of whether officers must issue warnings when utilizing police dogs on leash." *Maney v. Garrison*, --- Fed. App'x ---, 2017 WL 937460, at *4 (4th Cir Mar. 9, 2017) (Thacker, J.); *see also id.* at ** 12-14 (Traxler, J.) Moreover, Miller has not identified a single decision from the Supreme Court or Sixth Circuit adopting a bright-line rule that an officer must warn a suspect before allowing a dog to bite. Simply put, Miller has not identified authority that clearly establishes his warn-first rule.[5]

Finally, Miller argues that clearly-established law prohibited Jacobson from allowing Zando to run ahead on a "30 foot" lead and required Jacobson to keep Zando under closer control during the search. But, again, Miller has not identified any binding United States Supreme Court or Sixth Circuit authority that clearly

---

[5] There is a reasonable argument that Miller's proposed bright-line, warn-first rule could create real danger for officers in circumstances like those confronted by Jacobson. As Jacobson explained, he believed that he was tracking a potentially-armed suspect in a dark, densely-wooded area. Under these circumstances, an oral warning could have revealed his position and left him vulnerable to attack.

establishes that keeping a canine unit on a 30-foot lead violates a suspect's Fourth Amendment rights, especially where the suspect is potentially armed and is hiding in a dark, wooded area.[6]

For all of the reasons explained above, Miller has not shown that Jacobson violated his clearly-established Fourth Amendment rights, and Jacobson is therefore entitled to qualified immunity on Miller's excessive force claim.

## 2

Breining contends that he is entitled to summary judgment on Miller's excessive force claim because he was not involved in "directing and controlling the tracking dog [Zando]." (Jackson County Def.s' Mot., ECF #25 at Pg. ID 424.) Breining insists that he can only be held liable under Section 1983 for his "individual

---

[6] At the hearing on the Motions, Miller directed the Court to the decision of the United States Court of Appeals for the Eighth Circuit in *Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385 (8th Cir. 2007), as support for his argument that Jacobson had to keep Zando on a shorter leash. But the holding in *Szabla* did not turn on the length of the police dog's leash and did not clearly establish any rule with respect to the permissible length of a leash. Moreover, the Sixth Circuit has rejected excessive force claims where canines were not on *any* sort of leash or lead, *see, e.g.*, *Robinette v. Barnes*, 854 F.2d 909, 911 (6th Cir. 1988) (affirming district court decision granting summary judgment in favor of defendants in wrongful death claim after police dog was "released" from his leash and killed suspect); *Matthews v. Jones*, 35 F.3d 1046, 1048 (6th Cir. 1994) (affirming district court decision granting summary judgment in excessive force case where police dog was "released" from his leash and "ran approximately fifty feet into the woods"), and those decisions cast further doubt on Miller's claim that use of a 30-foot lead violated clearly established Fourth Amendment law.

actions" (*id*. at Pg. ID 425; quoting *Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014)), and he stresses that he was not in charge of directing or handling Zando during the search. (*See id.*)

Miller counters that an officer may be liable "for the use of excessive force" where the officer "(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force." (Miller Resp. Br., ECF #28 at Pg. ID 667-68, citing *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). Miller insists that he has established Breining's liability under the "active participation" and "duty of protection" theories. The Court disagrees.

**a**

Miller argues that Breining "actively participated in the use of excessive force" by "summon[ing Jacobson] and his canine to the scene, knowingly and wantonly provid[ing] Jacobson with false information, leading [Jacobson] to believe that [Miller] had a knife and had assaulted someone with a knife," and "accompany[ing] Jacobson on the search and seizure…." (*Id.* at Pg. ID 668.) But none of this amounts to active participation *in the application of the allegedly-excessive force*.

First, Breining's request for a canine unit does not equate to his active participation in Zando's much later application of force. Indeed, Breining requested

a canine unit to assist with the "track" of Miller (Breining Dep. at 23-24, ECF #26-5 at Pg. ID 605) – i.e., to assist in *locating* Miller in the dark and dense woods. There is no evidence that at the time Breining made that request he knew anything about Zando and/or about Zando's tactics, capabilities, modus operandi, and/or propensity to bite. Breining's request that an unknown dog help him find a Miller is a far cry from Breining participating in Zando's application of force to Miller.

Second, Breining did not actively participate in the application of force when he accompanied Jacobson and Zando on the search for Miller. Breining did not exercise any control of any kind over Zando during the track. In fact, he was far behind both Zando and Jacobson, and he could not even see them. (*See id.* at 16-17, ECF #26-5 at Pg. ID 603-04.) Moreover, Breining did not reach Miller until Zando had already released his bite. (*See id.* at 17-18, ECF #26-5 at Pg. ID 604.) Breining's limited role in the track did not constitute active participation in the application of force to Miller.

Third, Miller has not shown that Breining actively participated in the application of force by telling Jacobson that Miller could be armed with a knife. As an initial matter, Miller has not cited any cases in which any court has found "active participation" in the application of force through the mere providing of information – even if false. Furthermore, Miller has not presented any evidence that Breining intended (or even had reason to believe) that the information about the knife would

lead Zando to bite Miller or would increase the chances the Zando would do so. Again, the record reveals only that Breining summoned Zando to *track and locate* Miller (*see id.* at 23-24, ECF #26-5 at Pg. ID 605), and the record contains *no* evidence that Breining had any advance knowledge about how Zando operated and/or what Zando would do. Moreover there is no evidence that Breining and Jacobson discussed how the information about the knife would affect Jacobson's approach and handling of Zando. In short, Jacobson independently decided, based upon the information about the possibility of Miller being armed, to permit Zando to retain his bite of Miller, and, on this record, Breining cannot be said to have actively participated in that decision.

Finally, Miller's excessive force claim against Breining fails for an additional and related reason. The Fourth Amendment is "implicated" only when force is "intentionally applied," *Brower v. Inyo County*, 489 U.S. 593, 596 (1989), and Miller cannot make that showing against Breining because, as explained above, there is no evidence that Breining (1) intended that Zando would bite Miller and/or (2) had any reason to believe that Zando would do so. *See, e.g., Dunigan v. Noble*, 390 F.3d 486 (6th Cir. 2004) (affirming dismissal of a Fourth Amendment excessive force dog bite claim because officer did not intentionally apply force where he did not command the dog to bite and where bite was spontaneous); *Neal v. Melton*, 453 Fed. App'x 572 (6th Cir. 2011) (affirming dismissal of Fourth Amendment excessive

force dog bite claim where bite resulted from officer negligence, not intentional officer conduct; citing cases).

In short, Miller's excessive force claim against Breining fails because Breining did not actively participate in Zando's application of force to Miller and because, to the extent that Breining had a relationship to the interaction between Zando and Miller, he (Breining) did not intend (or have advance knowledge that) Zando would bite Miller.

**b**

Miller has also failed to show that Breining may be held liable for Zando's bite on the ground that he violated his "duty to protect" Miller. In *Turner*, the Sixth Circuit explained the duty to protect theory of liability as follows:

> It is clear that there are circumstances under which police officers can be held liable for failure to protect a person from the use of excessive force. Generally speaking, a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.

*Turner*, 119 F.3d at 429. Miller's reliance on this theory of liability fails because, as explained above, Miler has not presented any evidence that Breining knew or had reason to know that Zando would bite him (Miller). Miller has also failed to show that Breining could have prevented the bite. Indeed, Breining did not arrive on the scene until after Zando had released the bite. (*See* Breining Dep. at 17-18, ECF #26-

5 at Pg. ID 604.) Accordingly, Miller cannot avoid summary judgment on his excessive force claim against Breining by invoking the "duty to protect" theory.

**D**

In Count III of the Complaint, Miller alleges that Jacobson violated his rights under the Due Process Clause by, among other things, using excessive force in connection with his arrest. (*See* Compl. at ¶34, ECF #1 at Pg. ID 6.) In the Initial Opinion and Order, the Court dismissed this claim against Defendants Rybicki and Breining. The Court explained that "it is well-settled that where a particular constitutional amendment 'provides an explicit textual source of constitutional protection' against the government misconduct alleged by a plaintiff, that Amendment, not the more generalized notion of 'substantive due process, must be the guide for analyzing' the plaintiff's claim." (Initial Op. and Order, ECF #20 at Pg. ID 386; quoting *Graham*, 490 U.S. at 395). The Court further observed that because "[t]he Fourth Amendment protects against [the] type of [] misconduct" Miller alleged, "Miller [could not] not assert a due process claim based upon this purported conduct by Rybicki and Breining." (*Id.* at Pg. ID 385-86.) Miller has not shown any error in the Court's analysis or conclusion. The Court therefore grants Jacobson summary judgment on Miller's Due Process Clause claim.

Finally, in Count IV of the Complaint, Jacobson alleges that Blackman Township "developed or maintained policies or customs exhibiting deliberate indifference to the constitutional rights of persons in Blackman Charter Township, which caused the violation of [Miller's] rights."[7] (Compl. at ¶37, ECF #1 at Pg. ID 6.) At oral argument, Miller specified that this claim is based on his contention that Blackman Township's training policies and customs for canine units are insufficient and led to his injuries. In order to hold Blackman Township liable under 42 U.S.C. § 1983 "for [the] failure to train adequately, [Miller] must prove that the training program is inadequate to the task an officer must perform; that the inadequacy is the result of deliberate indifference; and that the inadequacy is closely related to or actually caused [his] injury." *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994).

In *Matthews*, the Sixth Circuit granted summary judgment in favor of a police department on a similar insufficient-training claim because "[t]he record contain[ed] no evidence that [the police dog] was inadequately trained, and, to the contrary, contain[ed] evidence of considerable training." *Id.* In addition, the plaintiff in *Matthews* "offered no evidence that this training was inadequate to the tasks which

---

[7] Though it is unclear from the Complaint whether Miller intends to bring this claim against the Blackman Township Police Department as well, to the extent he meant to name the police department in this claim, the claim fails for the same reasons as stated above.

a canine officer is required to perform, that there was deliberate indifference by the police department, or that inadequate training caused [the plaintiff's] injuries." *Id.* at 1049-50.

*Matthews* applies with full force here and bars Miller's insufficient-training claim. Just as in *Matthews*, Miller has not identified any evidence in the record that Zando was inadequately trained. In fact, Jacobson testified at length during his deposition about the training certifications that he and Zando received. Among other things, Jacobson said that he and Zando went through a yearly certification course in "narcotics, tracking, [and] bite work." (Jacobson Dep. at 33, ECF #26-4 at Pg. ID 584.) In addition, Jacobson testified that he and Zando would train "every week [for] four to five hours doing narcotics [and] bite work." (*Id.*) Jacobson even had his wife wear a "bite sleeve" and help lay out dog tracks to further train Zando. (*Id.* at 33-34, ECF #26-4 at Pg. ID 584.) Miller has not identified any evidence in the record that could create a genuine issue of material fact with respect to Zando's training. Nor has Miller produced any evidence that Zando had previously-attacked other individuals and Blackman Township ignored that fact or that there were other canine units in the police department that regularly engaged in excessive-force incidents which Blackman Township likewise ignored. Miller's claim against Blackman Township for inadequate training therefore fails.

## V

For the reasons stated above, **IT IS HEREBY ORDERED** that the Motions

(ECF ## 25 and 26) are **GRANTED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
Dated:  April 25, 2017                UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 25, 2017, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113